UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JANE ROE,

          Plaintiff,

    v.

VERIZON MEDIA INC.,

          Defendant.

Case No.  20-cv-03809-JCS

**ORDER DENYING VERIZON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART MOTIONS TO STRIKE**

Re: Dkt. Nos. 33, 35, 50

## I.    INTRODUCTION

Plaintiff Jane Roe asserts claims of sexual harassment and wrongful termination against her former employer, Verizon Media Inc. ("Verizon").  Presently before the Court are three motions: 1) Verizon's Motion for Partial Summary Judgment as to Plaintiff's Fourth and Fifth Causes of Action ("Summary Judgment Motion"); 2) Verizon's Motion to Strike and/or Disqualify Plaintiff's Experts Lisbeth Claus and Michael Francis Murphy ("Verizon's Motion to Strike"); and 3) Plaintiff's Motion to Strike and/or Disqualify Defendant Verizon Media's Experts Michael W. Minieri, William Brown, and Control Risks ("Plaintiff's Motion to Strike").  A hearing on the Motions was held on October 1, 2021.  For the reasons set forth below, the Court DENIES the Summary Judgment Motion and GRANTS in part and DENIES in part the motions to strike.[1]

## II.    BACKGROUND

### A.    The Complaint

This case was originally filed in California state court and was removed to federal court on

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

the basis of diversity jurisdiction.   In the Complaint, Plaintiff Jane Roe[2] alleges that Verizon failed to take adequate measures to protect her safety on a business trip in the Middle East, where she was assaulted and raped by a male executive who had "significant business dealings" with her employer ("the Business Acquaintance"), and that when Plaintiff subsequently was diagnosed with PTSD as a result of the attack, Verizon failed to accommodate her disability, failed to engage in an interactive process regarding accommodation and ultimately terminated her because of her disability.

Plaintiff asserts the following claims: 1) disability discrimination in violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a), based on the allegation that Verizon terminated Plaintiff because of her disability ("Claim One"); 2) failure to make reasonable accommodation in violation of FEHA, Cal. Gov't Code § 12940(m), based on the allegation that Verizon refused to grant Plaintiff's request for a finite extension of her medical leave of absence ("Claim Two"); 3) failure to engage in the interactive process in violation of FEHA, Cal. Gov't Code § 12940(n), based on the allegation that when Plaintiff requested temporary time off work to manage her mental disability symptoms Verizon terminated her instead of engaging in a good faither interactive process to determine a reasonable accommodation ("Claim Three"); 4) sexual harassment in violation of FEHA, Cal. Gov't Code § 12940(j)(1) based on the allegation that Verizon knew or should have known that requiring Plaintiff to work in the Middle East without security created a foreseeable risk that she would be harassed on account of her sex and become a victim of sexual assault, as in fact occurred ("Claim Four"); 5) failure to

---

[2] Although Plaintiff did not file a formal motion seeking leave to proceed under a pseudonym, the Court finds that special circumstances have, to this point in the case, justified keeping Plaintiff's identity confidential.  *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068–69 (9th Cir. 2000) "a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity.").  Given the traumatic nature of the events upon which Plaintiff's claims are based, there is a reasonable likelihood of harm to Plaintiff if her identity is disclosed.  If Plaintiff seeks to remain anonymous at trial, however, she will be required to file a formal motion that addresses whether anonymity is justified in light of "the public's common law right of access to judicial proceedings, *see Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598–99, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *EEOC v. Erection Co., Inc.*, 900 F.2d 168, 169 (9th Cir.1990), and Rule 10(a)'s command that the title of every complaint 'include the names of all the parties,' Fed.R.Civ.P. 10(a)." *Id.*

United States District Court
Northern District of California

1    prevent discrimination and harassment in violation of FEHA, Cal. Gov't Code § 12940(j)(1) & (k)

2    based on the allegation that Verizon foresaw the risk of Plaintiff's travel plans and nonetheless

3    permitted her to travel without adequate security ("Claim Five"); 6) wrongful termination in

4    violation of public policy based on FEHA violations ("Claim Six");[3] and 7) violation of California

5    Labor Code § 1102.5 based on the allegation that she was terminated in retaliation for her report of

6    criminal conduct to Verizon and the FBI, and for taking disability leave ("Claim Seven").

7        **B.    Factual Background**

8            The parties have presented extensive evidence in connection with their briefing on

9    Verizon's Summary Judgment Motion.  While the Court does not attempt to summarize all of this

10   evidence, it provides below a summary of the evidence most pertinent to its conclusions.  Unless

11   otherwise stated, the facts set forth below are undisputed.

12           Plaintiff worked for one of Verizon's "media brands" from April 2017 until March 2019.

13   Declaration of Melinda S. Reichert in Support of Defendant Verizon Media Inc.'s Motion for Partial

14   Summary Judgment as to Plaintiff's Fourth and Fifth Causes of Action ("Reichert Decl."), Ex. A (Roe

15   Depo.) at 36-37.   Plaintiff's job involved organizing start-up competition events around the world,

16   which included traveling to the locations where the events were to occur on "scouting trips" and,

17   among other things, arranging for and conducting "meet-ups" with individuals in those locations to

18   raise awareness of the competitions.  *Id.*  at 51-55.  Thus, while employed by Verizon, Plaintiff

19   frequently travelled internationally, going on scouting trips to Nairobi, Berlin, London, Paris and Tel

20   Aviv, to name just a few.  *Id.* at 52-53.

21           The events that are the basis of Claims Four and Five occurred on a scouting trip in Beirut,

22   Lebanon in July 2018, where Plaintiff traveled to prepare for an event planned to occur in October of

23   that year.  Declaration of N.D. in Support of Defendant Verizon Media Inc.'s Motion for Partial

24   Summary Judgment ("Manager Decl.") ¶ 3; Reichert Decl., Ex. A (Roe Depo.) at 169.  Plaintiff

25   testified at her deposition that the trip was booked "very last minute" and that she had understood that

26

27   ――――――――――――――

28   [3] In the Complaint, both this claim and the previous claim are labeled "Fifth Cause of Action."  To
     avoid confusion, the Court refers to this claim as Claim Six and the claim that follows (labeled
     "Sixth Cause of Action") as Claim Seven.

United States District Court
Northern District of California

the event in Beirut "was not supposed to happen" if "certain timelines" were not met because the media brand "wouldn't have the resources to execute on them."  Declaration of Christian Schreiber in Support of Plaintiff's Opposition to Defendant Verizon Media, Inc.'s Motion for Partial Summary Judgment as to Plaintiff's Fourth and Fifth Causes of Action ("Schreiber Decl."), Ex. 1 (Roe Depo.) at 84, 99-100.  Plaintiff began planning the trip when her manager told her the event was to go forward. *Id.* at 100.

According to Plaintiff, when her manger told her the event would go forward, he also told her that there "wasn't anyone to go with [her]" because the editorial department of the media brand was "spread too thin."  *Id.*  She testified that she expressed concern about traveling to the Middle East alone to her manager and other Verizon executives.  *Id.* at 98-101, 142, 160-161.  Likewise, Plaintiff's manager expressed concerns about security in a Slack message chain with Plaintiff a few weeks before the trip:

> **July 4, 2018**
>
> Plaintiff:  Overview: talked to several folks and the consensus seems to be hit Tunis, Cairo, Dubai, Beirut and in that order bc its easiest flight-wise. . . .
>
> Manager:  Ok. well, is Tunis safe for you to visit? What is State saying?
>
> Plaintiff:  I triple checked with folks on Tunis – safe
>
> Manager: ok
>
> Plaintiff: but also very imp to visit, because its where the call centers used to be concentrated so lots of tech dev happening there Although like most of the region could all be shifted based on politics originally facebook had also suggested amman, but I dont think its necessary people are saying there is more buzz about amman than action and i think it make sense to do 2 meetups in cairo bc its such a huge market
>
> Manager:  make sure you have A+ hotel and travel arrangements. no taxis or other open field stuff.
>
> Plaintiff: and people don't always travel across the whole city yea, I'll make sure its very secure. I also have contacts on the ground there I can rely on.
>
> **July 5, 2018**
>
> Manager: Thinking more about your middle east travel. Traveling alone really can't approve. too many strikes in the risk zone, starting

1

2

> with alone. I think you will need to handle this virtually,
>
> Plaintiff: [Verizon employee] is finding someone to travel with me. We need to visit the market to launch it and these are the places that come at the suggestions of all our partners.  The place I feel like I need someone with me for crowd control is the meetup in Cairo.  Does [Verizon coworker]  need to be pulled for latam or could he do mena since he is close by in europe and someone from the US does LATAM?
>
> Manager: I need someone in LATAM who can be a presence.  Maybe we can switch but ... not deciding this evening.

3

4

5

6

7    Schreiber Decl., Ex. 7 (Slack message chain).  Plaintiff testified at her deposition that she believed

8    her manager's suggestion that the launch be handled virtually was not "sincere" and that they

9    "were all under a shared understanding that these events required [them] to go to the markets and

10   prepare for them, both from a logistical perspective of . . . what is going to take place" and also to

11   "hold meet-ups."  *Id.* at 151-152.

12        It is undisputed that ultimately it was decided that the coworker proposed by Plaintiff in

13   the Slack message chain quoted above ("the Coworker") would accompany her on the trip and that

14   Verizon permitted her to go on the trip.  It is also undisputed that the Coworker's role on the trip

15   was *not* to provide security for Plaintiff.  *See* Schreiber Decl., Ex. 1 (Roe Depo.) at 102 (testifying

16   that it was "not considered security" to have the Coworker accompany Plaintiff); Ex. 3 (Manager

17   Depo.) at 79 (testifying that he did not view Coworker traveling to the Middle East with Plaintiff

18   as a "security measure" for Plaintiff); Ex. 5 (Coworker Depo.) at 29 (testifying that Coworker did

19   not understand that he was being asked to travel with Plaintiff as a security measure).

20        The evidence in the record about what Verizon's security departments knew about

21   Plaintiff's trip and how it was handled is somewhat confusing. Elaine Ball was designated by

22   Verizon as a Rule 30(b)(6) person most knowledgeable as to Verizon's security policies and

23   practices.  She is the Regional Security Manager for Verizon Media Inc. (previously Yahoo! Inc.

24   and briefly, Oath Inc. before it became Verizon Media), where she has worked since 2009.

25   Declaration of Elaine Ball in Support of Defendant Verizon Media Inc.'s Motion for Partial

26   Summary Judgment ("Ball Decl.") ¶¶ 1-2.   Ball states that her department was called Corporate

27   Safety and Security ("CSS") in 2018 and is now called Global Security and Safety ("GSS") and

28   that she was (and continues to be) responsible for corporate security management for Europe, the

United States District Court
Northern District of California

Middle East and Africa. *Id.* ¶ 3. According to Ball, she personally reviewed risk ratings provided by Control Risks, "a well-respected international security organization that has expertise in the Middle East." *Id.* ¶ 4. In addition, she reviewed the U.S. Department of State's Overseas Security Advisory Council ("OSAC") reporting about specific locations. *Id.* ¶ 5. Based on this information, Ball states, she would designate certain countries and locations as "high risk" in Verizon's Concur travel system. *Id.* ¶ 6. These locations were "red-flagged" such that Ball's department received notifications when an employee booked travel through Concurs to a high risk destination. Schreiber Decl., Ex. 4 (Ball Depo.) at 19-20. According to Ball, Beirut in 2018 was designated as "medium risk" by Control Risks and OSAC and that information "formed the basis for how Beirut was designated by the Company." Ball Decl. ¶ 7. She further states that because Beirut was not "red-flagged" as high risk in the Concur travel booking system, she was not aware that Plaintiff would be traveling to Beirut. *Id.* ¶ 18.

Ball states that in 2018, Verizon began using UnitedHealth Care Global to provide medical care and security to Verizon employees travelling abroad, replacing former service provider International SOS. ¶ 13. According to Ball, the services provided by UnitedHealth Care Global were "above and beyond what was provided by the contracted security services provided by Control Risks and other security providers similar to Control Risks." *Id.*

In her declaration, Ball also describes various resources available to Verizon employees on its intranet, including a document called "Yahooing Globally – Travelling Safely" that told employees what to do in an emergency while travelling and how to contact International SOS for assistance, including how to log on using Verizon's membership information. *Id.* ¶ 16 & Ex. B. That document instructs employees to "Call SOS immediately" if there is an emergency and that it will "provide immediate advice and activate services." *Id.* Ex. B.[4] Another document on the intranet, which Ball states in her declaration that she wrote, is called "Yahoo! Female Business Travelers[,]" which lists "additional precautions" that female travelers "might want to consider."

---

[4] Elsewhere in her declaration, Ball states that to even after SOS International was replaced by UnitedHealth Care Global, in 2018, Plaintiff could have called SOS International and it would have provided her with assistance. Ball Decl. ¶ 13.

1    *Id.* ¶ 17.

2           Ball states in her declaration that "the Company[5] maintains a few policies that specifically

3    address travel security" but that it has "made a conscious decision not to have policies that detail

4    the rules for every single possible scenario because it is our belief in the security community that

5    situations can change rapidly and that we have to be able to respond in the best way possible in the

6    moment without being constrained by a policy that could limit actions." *Id.* ¶ 14.

7           Verizon has also offered another declaration, by Steven Kellner, who states that he is the

8    "Travel Security Manager in the Corporate Security Department for Verizon Communications[,]"

9    a position he has held since January 2008.  Declaration of Steve Kellner in Support of Defendant

10   Verizon Media Inc.'s Motion for Partial Summary Judgment ("Kellner Decl.") ¶ 1.  Kellner states

11   that his "principal duties include managing travel risks and business travelers" and that in 2018 he

12   "generally oversaw business travel for Verizon Media, but other security professionals within

13   Verizon Media handled the majority of the day-to-day operational work." *Id.* ¶ 2.  According to

14   Kellner, "in 2018 and now, for every international trip an employee books through the Concur

15   travel system, the employee is sent an email from the general automated Verizon Corporate

16   Security email account with security-related information for the travel destination including

17   current safety or security considerations (crime prevalence), political violence, civil unrest, and

18   other matters to consider such as vaccinations prior to trial." *Id.* ¶ 3.  He states that "[t]hese emails

19   are not sent through Verizon Media . . . but come from Verizon" and the information in the emails

20   "comes from Verizon's emergency assistance provider, UnitedHealth Care Global." *Id.*  Thus, he

21   states, the risk ratings in these emails may be different from the risk ratings entered into the

22   Concurs travel system by the Verizon Media security team. *Id.*  According to Kellner, Plaintiff

23   received two of these automatically generated emails prior to her departure providing information

24   about Beirut and another regarding Tunis. *Id.* ¶¶ 5, 7 & Exs. A, B, G.  The emails relating to

25   Beirut were sent on July 10, 2018 and July 18, 2018 and both list a "City Threat Rating" of "4

26   (high)." *Id.*, Exs. A, B ("Beirut Emails").  The threat level for Tunis was also listed as "4 (high)."

27

28   _____
     [5] The declaration does not define this term.  The Court presumes it refers to Verizon Media.

United States District Court
Northern District of California

*Id.*, Ex. G.

Kellner states that he reviews these emails and sends the employee a personalized email if they are traveling to a destination he considers "unique," that is, "if travel to the location is very infrequent, the risks seem high, or [he has] any other concerns based on [his] years of experience in corporate security and safety." *Id.* ¶ 9.  In Plaintiff's case, Kellner states that he reviewed the emails Plaintiff was sent about Beirut and Tunis.  *Id.* ¶¶ 9, 12.  Although those emails listed the city threat level as "high" for both Tunis and Beirut, Kellner considered only Tunis "unique" and therefore sent a personalized email to Plaintiff about security during her visit to Tunis but did not send a personalized email as to Beirut.  *Id.* ¶¶ 9-12.  Kellner explained that he considered Tunis to be unique because Verizon does not "do a lot of business in Tunisia and [does] not send people to that location frequently" whereas the threat rating for Beirut was "largely based on anti-government protests, as opposed to crime targeting business travelers or some other concerns that [he] would have considered to be high risk for Verizon employees." *Id.* ¶ 12.  He further states that the "Beirut risk rating had nothing to do with incidents of sexual assault, either by a stranger or acquaintance." *Id.*

The Beirut Emails contained a section with the header "City Security Issues," which listed the following issues:

- Political tensions persist in Lebanon and long-term concerns remain regarding overall stability. These concerns particularly apply to Beirut.
- Terrorist attacks by the Islamic State (IS) and al-Qaeda-linked groups have targeted Beiruit and police frequently disrupt plots targeting Shiites or Westerners in the city.
- The greater Beirut area has experienced a series of political bombings and assassinations. Due to the current situation, additional bombings are likely.
- Demonstrations and crime also affect security conditions in Beirut.

Kellner Decl., Ex. A (Beirut Email).  With respect to the last bullet-point, the emails states:

> **Crime**: The threat of crime is usually not a serious security concern to travelers in Beirut; However, crime does occur. The types of crime that are most likely to affect foreign visitors to the city include petty crime, such as pickpocketing, theft and purse or bag snatching. Theft from vehicles is also a concern.

*Id.*

On the evening of Plaintiff's assault, she and her Coworker met the Business Acquaintance for drinks.  Schreiber Decl., Ex. 2 (Roe Depo.) 176.  Plaintiff testified that the Business Acquaintance was a "prominent investor" who her manager described as a "good, old friend" of Verizon and that her manager had told her to meet with him.  *Id.* at 170, 172.  Similarly, her manager testified that he was not surprised Plaintiff arranged to meet the Business Acquaintance because he was a "prominent venture capitalist in the Middle East" and the "type of person that we would be checking in with when we were developing a show that was oriented around start-ups in the Middle East."  Reichert Decl., Ex. B (Manger Depo.) at 95.  Plaintiff testified that she had to take a business call and joined the Coworker and the Business Acquaintance about an hour late, at which point it was "pretty clear they had had a few drinks."  Schreiber Decl., Ex. 2 (Roe Depo.) at 176.

At some point, Plaintiff, the Coworker and the Business Acquaintance continued on to a concert.  *Id.* at 182.  There, the three danced together and the Business Acquaintance kissed Plaintiff.  *Id.* at 190.  Plaintiff testified that she felt "very uncomfortable" and didn't know what to do because she had never been in a situation where someone who was trying to kiss her was "important for work" and "important for [her] boss."  *Id.*  According to Plaintiff, at this point the Coworker was "clearly drunk," "putting his arm over strangers, and trying to take selfies," and "sloshing around [and] spilling his drink."  *Id.* at 184-185.  Plaintiff testified that security guards told her she had to get the Coworker out of the concert venue and that she was trying to get him to leave but that he did not want to go.  *Id.* at 185-186.  She testified the Business Acquaintance offered to help get the Coworker back to the hotel and so they escorted him out of the concert together and took an Uber back to the hotel where Plaintiff and her Coworker were staying.  Schreiber Decl., Ex. 2 (Roe Depo.) at 192.[6]

---

[6] The Coworker testified that he did not think he was drunk when he returned to the hotel that night and did not need assistance getting into the taxi home but he also testified that he had a beer before Plaintiff joined the Coworker and the Business Acquaintance, two or three drinks after she joined them at the bar and another two or three drinks at the concert, and that he did not have dinner that evening.  Schreiber Decl., Ex. 5 (Coworker Depo.) at 57-59, 75.  The Coworker's testimony also diverged from Plaintiff's account in that he testified that Plaintiff and the Business

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Plaintiff testified that once back at the hotel, the three got on an elevator together; Plaintiff

2 suggested the three go to a rooftop bar, where she thought the Coworker could "just sit and not be

3 bothered" but instead, the Coworker got off the elevator at a lower floor, leaving Plaintiff alone

4 with the Business Acquaintance. *Id.* at 191-193. When they arrived on the roof, they found the

5 bar closed and the space dark. *Id.* at 195. The Business Acquaintance began to touch her and she

6 told him, "No . . .there's . . . some sort of misunderstanding" and that she was "not interested."

7 *Id.* 195-196. She told him she was going to her room and he "[kept] not listening to her" and

8 "follow[ed] [her] to [her] room." *Id.* at 197. Plaintiff testified that he followed her into her room

9 and she didn't know what to do.[7] *Id.* She also testified that while in her room he called the front

10 desk to have condoms brought to the room and that when they were delivered she "want[ed] to

11 scream, but [she] [couldn't] make a scream come out" and was "frozen." *Id.* at 198-200.

12 According to Plaintiff, the Business Acquaintance raped her in the room and then she suggested

13 they go to the rooftop to look at the moon in an attempt to get him out of the room. *Id.* at 200. He

14 agreed and they went to the rooftop, where the rape continued but the Business Acquaintance was

15 not as "aggressive." *Id.* at 201. Eventually, they left the rooftop and the Business Acquaintance

16 allowed Plaintiff to return to her room alone. *Id.* at 200-201.

17   According to Plaintiff, after the assault and rape she contacted a senior woman in the

18 Editorial Department at the Verizon media brand where she worked, Jordan Crook, and told her

19 what had happened. Schreiber Decl., Ex. 2 (Roe Depo.) at 202. She also contacted a friend, who

20 advised Plaintiff to leave for New York. *Id.* at 201-202. The next morning, she told her

21 Coworker that the Business Acquaintance had been "sexually aggressive" with her. *Id.* at 206.

22 The Coworker did not report the assault to Verizon, however, testifying that although Plaintiff told

23 him she had been sexually assaulted, it appeared to be a private matter. Schreiber Decl., Ex. 5

24

25

26 Acquaintance had "effectively . . .become a couple for the evening" and that he did not "notice
any conduct by [the Business Acquaintance] that concerned [him] in any way." Reichert Decl.,
Ex. C (Coworker Depo.) at 82, 92.

27 [7] There is no evidence in the record that Plaintiff invited the Business Acquaintance to her room.
To the contrary, in response to Verizon's counsel question "Did you tell [the Coworker] that you
had invited [the Business Acquaintance] back to your room?" Plaintiff responded, "No. I didn't

28 invite [the Business Acquaintance] back to my room." *Id.* at 206.

United States District Court
Northern District of California

(Coworker Depo.) at 49-50.  Plaintiff testified that her Coworker left at that point and she was alone in Beirut, scared that the Business Acquaintance might return and not knowing "who to . . . report what to, or what [she] should be doing at that point."  Schreiber Decl., Ex. 2 (Roe Depo.) at 215.  It appears to be undisputed that neither Plaintiff nor anyone else contacted Verizon's emergency assistance vendor in connection with the assault.

Verizon presents evidence that on August 9, 2018, after Plaintiff's manager learned of the assault, he sent an email to "appropriate company employees" instructing them that the Business Acquaintance should not be permitted to attend any future company events.  Manager Decl. ¶ 13 & Ex. A.  But according to Plaintiff, she subsequently received messages from the Business Acquaintance telling her he would be attending a Verizon event in San Francisco in September 2018 that Plaintiff also would be attending. Reichert Decl., Ex. A (Roe Depo.) at 272.   Plaintiff testified that Verizon agreed to provide 24/7 close security for her during that event but told her it would not "uninvite" the Business Acquaintance from the event.  *Id.*  It is undisputed that the Business Acquaintance was not permitted to enter the United States when he arrived to attend the event after Plaintiff reported the rape and assault to the FBI.  *Id.*   When Plaintiff was informed by the FBI that the Business Acquaintance had been intercepted at the border she passed that information on to Verizon and the security that was being provided for Plaintiff was discontinued. *Id.* at 272.  When a group of 18 Verizon employees traveled to Beirut in October 2018, Plaintiff's manager requested additional security for the team, fearing that the Business Acquaintance might retaliate because he had been turned around at the border by the FBI.  Manager Decl. ¶ 15. Plaintiff did not accompany the group on that trip.  Reichert Decl., Ex. D (email to Steve Kellner stating "it has been confirmed that [Roe] is not going to [be] traveling to Beirut for this event").

Plaintiff's Manager states in his declaration that he had no knowledge that the Business Acquaintance "might assault Plaintiff, whether he had ever assaulted anyone before, or that he was the type of person who might engage in a sexual assault."  Manager Decl. ¶ 18.  According to the manager, he had only had three interactions with the Business Acquaintance, "all related to business."  *Id.*  Prior to the assault, he "regarded the person Plaintiff said assaulted her as a respected venture capitalist who had served as a busines partner for one event in Berlin and had

11

1   visited our office in San Francisco." *Id.*  He stated further, "I had no reason to believe that the

2   person Plaintiff said assaulted her would hurt her in any way." *Id.* ¶ 19.

3          Verizon offers evidence that the assault on Plaintiff was discussed at a department meeting

4   of the Corporate Safety and Security Department. Ball Decl., ¶ 18.  That department did not

5   conduct any investigation of the assault, however, because it was being "handled by HR."

6   Schreiber Decl., Ex. 4 (Ball Depo.) at 119.   Other than Ball's testimony, there is no evidence in

7   the record about an investigation by HR or of any other investigation by Verizon.

8       **C.   Expert Opinions**

9           **1.   Plaintiff's Experts**

10              a.   Claus

11          Plaintiff has retained Dr. Lisbeth Claus as an expert on employer duty of care. Dr. Claus

12   has been a member of the faculty of Willamette University since 2003 and is currently a Professor

13   of Management and Global Human Resources at the Atkinson Graduate School of Management.

14   She has authored 31 publications on the topic of employer duty of care and "conducted over 150

15   presentations, webinars and workshops on four continents to inform employers of their obligation

16   to protect their business travelers, international assignees, and dependents."  Gruber Decl., Ex. E

17   (Claus June 18, 2021 Expert Report) at 2.[8] Dr. Claus was the author of a *Duty of Care* white paper

18   in 2009 that was a "major impetus for putting employer duty of care on the map for global

19   organizations." *Id.*  In 2012, she was the author of a *Duty of Care and Travel Risk Management*

20   *Global Benchmarking Study* ("the 2012 Study"), which was "the first empirical study on duty of

21   care." *Id.*  She also conducts duty-of-care audits of companies in which she applies an eight-step

22   plan-do-check model that she developed in the 2012 Study. *Id.* at 4.  According to Dr. Claus,

23   these eight steps are "now the industry standard for assessing whether employers meet baseline

24   duty of care standards." *Id.*

25          In her June 18, 2021 Expert Report, Dr. Claus applies the eight-step approach to Verizon's

26   security practices and procedures, offering opinions as to their adequacy generally and also

27   _____

28   [8] The June 18, 2021 Claus Report replaces the earlier expert report, dated April 30, 2021, to take
    into account the late-produced Beirut Emails.

United States District Court
Northern District of California

addressing whether Verizon's conduct with respect to Plaintiff's travel specifically was consistent with industry standards. *Id.* She concludes that 1) "Verizon failed to follow duty of care baseline and best practices in at least seven of the eight steps that are common practice in the management of international business travelers by employers and did not take appropriate steps to mitigate travel risks"; 2) "Verizon failed to meet the standard of duty of care to their female employee, Jane Roe, during her frequent international business travel while employed at [Verizon]"; and 3) The foreseeable risk of serious physical harm, including a sexual assault (and subsequent post-traumatic stress disorder), of a woman traveling without security to a Middle Eastern Country could have been mitigated if Verizon had followed prevailing duty of care practices." *Id.*

   b.  Murphy

Plaintiff has also retained as an expert Michael Francis Murphy to address the way personal security is planned in connection with travel to high risk and lower risk areas and whether any customary procedures would have "impacted the outcomes of Plaintiff's travel and assault." Gruber Decl., Ex. B (April 30, 2021 Murphy Expert Report) at 2. Murphy is a veteran of the United States Army and a graduate of the Army Ranger School. *Id.* at 3. He served in four deployments in Afghanistan between 2008 and 2011 with the elite 1st Ranger Battalion 75th Ranger Regiment. *Id.* After leaving the Army with an honorable discharge, Murphy worked as a private security guard at a nightclub for approximately two years. *Id.* at 4. In 2013, he attended the Gavin de Blecker & Associates Essential Protection Skills Academy, "which is considered the preeminent executive protection program in the world." *Id.* Since 2014, Murphy has worked as an executive protection independent contractor with HAVN Security Group (formerly M2 Security) and Eastman Protective Agency. *Id.* at 5. In that capacity, he has been involved in risk mitigation planning and "traveled all over the world keeping celebrities, corporate executives, and high net worth individuals and their families safe from many kinds of threats." *Id.*

Murphy opines that Beirut in 2018 was a "high threat area for Americans, especially for women, and should have been noted as a 'red-flag' destination by Verizon." *Id.* at 11. He further opines that Verizon fell short in numerous respects with respect to risk mitigation planning in light of Plaintiff's profile (a young female foreign business traveler) and the information available as to

13

the risk level in Beirut.  *Id.*  at 11-12.  He states that under the facts of this case, Verizon should

have provided a security agent to be with Plaintiff during the entirety of her time in Beirut and

opines that if such protection had been provided the assault by the Business Acquaintance likely

would have been prevented.  *Id.*  at 12-14.  He further opines that the lack of advance security

planning and training exacerbated the harm from the assault because "Plaintiff was left without

critical resources[,]" as evidenced by her testimony that "she did not recall the name of the hotel

after the attack and did not know who to call or whether it was safe to report the crime."  *Id.*  at 14.

In his supplemental report dated June 18, 2021, filed to address the late-produced Beirut Emails,

Murphy reiterates these opinions and opines that the new documents offer additional evidentiary

support for them.  Gruber Decl., Ex. F (Murphy June 18, 2021 Expert Report).

### 2.  Defendant's Experts

#### a.  Minieri

Verizon has retained Michael Minieri as an expert on corporate security.  Minieri Decl.,

Ex. A (May 26, 2021 Expert Report of Michael Minieri) at 2.  Minieri has worked as an

independent security consultant since 2001.  He holds various certifications, including one in

security management from ASIS International.  *Id.*  He has provided services to "nearly 200

distinct clients" "involv[ing] over 1000 facilities worldwide."  *Id.*  He worked as a police officer

for 3 to 4 years, has traveled to 37 countries, and lived as an ex-patriot in five countries, two of

which were in the Middle East.  *Id.*  He has twice been the "protected subject" of a Close

Protection Detail ("CPD") and has also provided such services to principals.  *Id.*

Minieri opines that under all of the circumstances, provision of close protection (ie., a

bodyguard) to Plaintiff during her trip to Beirut would have been "clearly unjustifiable,

completely unwarranted and totally ineffective, from the perspective of any unbiased, qualified,

knowledgeable and experienced security professional."  *Id.* at 3.  He further opines that providing

close protection under these circumstances is "not – even remotely – 'a common industry practice'

" and that no peer-reviewed publication known to Minieri would recommend such an approach.

*Id.*  Minieri also opines that Beirut was a medium risk location and that "[a]ny claims or

suggestions that this information is 'unreliable' or"'inaccurate' – and that Beirut should have been

14

1    rated as 'HIGH' (aka 'Red Flagged') – are without merit or any sound basis in fact and without

2    any supporting substantiation." *Id.* at 3.

3         Minieri also offers extensive opinions that focus on the fact that Plaintiff was allegedly

4    raped by an acquaintance rather than a stranger.  According to Minieri, because of this distinction,

5    the assault could not have been foreseen by Verizon. *Id.* at 4.  He further opines that there is

6    "[n]o evidence . . . that even remotely suggests that the Plaintiff had a <u>desire or intent</u> to request

7    the assistance of any third party at any time, or that she attempted to do so, but was prevented

8    from doing so due to a lack of available communication methods." *Id.* (emphasis in original).

9    Rather, he continues, "**under the totality of the actual circumstances,  . . . ONLY the Plaintiff**

10   **herself could have prevented or mitigated this event in any way. No reasonable and practical**

11   **action on behalf of the Defendant would have made any material difference in this case**." *Id.*

12   (emphasis in original).  Minieri describes what he believes were opportunities Plaintiff had to get

13   help and opines that by kissing the Business Acquaintance she would have conveyed to him and to

14   onlookers that his advances were not unwelcome. *Id.*   Minieri concludes that "[u]ltimately, given

15   that the Plaintiff was not held at gunpoint, knifepoint or physically restrained in anyway, the

16   circumstances suggest that the entire incident would have been most easily avoided had the

17   Plaintiff – at the very least -- simply explained her position on the matter to the business associate

18   at any point prior to the actual alleged assault." *Id.*

19        Minieri opines that Verizon "demonstrated exceptional diligence regarding staff travel

20   security by retaining a prominent Travel Risk Advisory Service" and that "employing this service

21   in this specific case [was] a 'Global Best Practice' in the Security Profession." *Id.* at 6.  He also

22   opines that Verizon "provides pre-travel safety and security briefings" and states, "I am advised

23   that the Plaintiff attended one or more such sessions during her period of employment, prior to this

24   trip, [which is] a 'Global Best Practice' in the Security Profession." *Id.* at 7. Finally, he opines

25   that "[t]he Plaintiff initially refused an offer from the employer to assign an additional employee

26   to accompany her, however, the employer insisted and one was assigned to the trip, her refusal

27   notwithstanding." *Id.*

28        In his May 26, 2021 Expert Report, Minieri states that his opinions are based on the

United States District Court
Northern District of California

following documents:   "A. Report of  Plaintiff's expert Lisbeth Claus ('Duty of Care') not dated[;]  B. Deposition of Lisbeth Claus ('Duty of Care') dated 20 May 2021[;]  C. Report of Plaintiff's expert Michael Francis Murphy ('Close Protection') signed 30 April 2021[;] D. Deposition of Plaintiff's expert Michael Francis Murphy ('Close Protection') dated 17 May 2021." *Id.* at 13.  He states further, "Additional information was provided by Defendant's counsel during a 75-minute phone conversation on 7 May 2021."  *Id.*  No additional evidence is listed in Minieri's Expert Supplemental Rebuttal Expert Report dated July 7, 2021.

> b.   Control Risks

Verizon has also provided a rebuttal expert report from Control Risks drafted by Angiolo Tosi and Andrew Freeman of Control Risks "under the supervision of William Brown" and signed by the Director of Control Risks, Matthew Burnard.  May 28, 2021 Control Risks Expert Witness Report at 1, 29.  In that report, Control Risks addresses the opinions of Plaintiff's experts, rejecting Murphy's opinions that Beirut in 2018 was high risk and that Plaintiff should have been provided with a bodyguard.  *Id.*  at 1. Control Risks also provided a supplemental rebuttal report dated July 7, 2021 responding to the supplemental reports of Claus and Murphy.  That report, like the previous report, was prepared by Tosi and Freemen under Brown's supervision but it is signed by Brown.  July 7, 2021 Control Risks Expert Witness Supplemental Report.

**D.     The Pending Motions**

> **1.   Verizon's Motion to Strike**

Verizon asks the Court to strike the testimony of both of Plaintiff's experts and disqualify them as experts pursuant to Rules 403, 702 and 704 of the Federal Rules of Evidence.   It argues that Claus's testimony "lacks sufficient probative value to be useful in evaluating Verizon Media's liability to Plaintiff, is improperly based on assumptions and guesswork, lacks foundation, and lacks the requisite expert qualifications."  Notice of Motion at 2.  Verizon further asserts that Murphy "lacks the requisite expert qualifications, and that [his] purported 'expert' testimony is improperly based on assumptions and guesswork, lacks foundation, and lacks sufficient probative value to be useful in evaluating the liability of Defendant for the sexual assault of Plaintiff, the risk to Plaintiff of being sexually assaulted in Beirut at the time of Plaintiff's travel,

the appropriateness of protective security for Plaintiff during her time in Beirut, and whether close protection detail or a bodyguard would have prevented the sexual assault by an acquaintance assailant under the circumstances."

### 2.  Plaintiff's Motion to Strike

Plaintiff asks the Court to strike the expert opinions that have been offered by Defendants' experts and disqualify Minieri, Brown, and Control Risks as experts under Rule 403 and 702 of the Federal Rules of Evidence.   She contends "Minieri lacks basic expertise in the matters on which he has opined and he is therefore not qualified as an expert and that Minieri's testimony lacks sufficient probative value to be useful to the Court in better understanding or determining the relevant legal issues in this case."  Plaintiff further asserts that Brown's opinions are unreliable because they are not sufficiently based on personal knowledge and facts of this case, and that Control Risks should be disqualified based on its conflict of interest in opining on the quality of its own work.

### 3.  Verizon's Summary Judgment Motion

In its Summary Judgment Motion, Verizon asks the Court to grant summary judgment on Claims Four and Five because the undisputed material facts establish, as a matter of law, that: 1) Verizon did not know, and had no reason to know, that the Business Acquaintance would sexually assault Plaintiff; 2) Verizon took immediate and appropriate corrective action to provide security measures for Plaintiff and other employees after the sexual assault occurred; and 3) Verizon took reasonable steps to prevent future sexual harassment by the Business Acquaintance.  Plaintiff argues that there are disputes of material fact that make summary judgment on these claims improper.  She also argues that the Kellner Declaration should be stricken because he was not listed in Verizon's Rule 26 disclosures.  In addition, Plaintiff contends Kellner cannot speak on behalf of Defendant Verizon Media and his testimony is improperly being offered on behalf of non-party Verizon Communications, Inc. [9]

---

[9] The Court assumes without deciding that the Kellner Declaration is admissible because even if it were to strike that declaration, it would reach the same result herein.

United States District Court
Northern District of California

United States District Court
Northern District of California

## III.   ANALYSIS

### A.   The Motions to Strike

#### 1.  Legal Standards

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation  . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id.* (quoting Webster's Third New International Dictionary 1252 (1986)).   The Court declined to set forth a definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met.  *Id.* at 593.  These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or

1    potential rate of error; and 4) the degree of acceptance in the relevant scientific community.

2    *Daubert*, 509 U.S. at 592-94.

3          The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by

4    "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the

5    expert's research has been subjected to peer review."  *Daubert v. Merrell Dow Pharmaceuticals,*

6    *Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*").  However, when such evidence is not

7    available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how

8    they went about reaching their conclusions and point[ing] to some objective source – a learned

9    treatise, the policy statement of a professional association, a published article in a reputable

10   scientific journal or the like – to show that they have followed the scientific method, as it is

11   practiced by (at least) a recognized minority of scientists in their field."  *Id.*  at 1319.

12         The second requirement under Rule 702, that expert testimony must "assist the trier of fact

13   to understand the evidence or to determine a fact in issue," "goes primarily to relevance."  *Id.* at

14   591.  This is a question of "fit," and "is not always obvious."  *Daubert*, 509 U.S. at 591.  The

15   Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for

16   other, unrelated purposes."  *Id.*  To meet this requirement there must be "a valid scientific

17   connection to the pertinent inquiry."  *Id.*  In other words, the expert testimony must "logically

18   advance[ ] a material aspect of the proposing party's case."  *Daubert II*, 43 F.3d at 1315.  This

19   requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of

20   Evidence, "reflecting the special dangers inherent in scientific expert testimony."  *Jones v. U.S.*,

21   933 F. Supp. 894, 900 (N.D. Cal., 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert  II*, 43 F.3d at

22   1321 n. 17).  In particular, expert testimony "'can be both powerful and quite misleading because

23   of the difficulty in evaluating it.'"  *Id.* (quoting *Daubert*, 509 U.S. at 595 (citation omitted)).

24   "Therefore, a federal judge should exclude scientific expert testimony under the second prong of

25   the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in

26   dispute in the case.'"  *Id.* (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

27         "[A] major principle underlying the *Daubert* gatekeeping function is that the trier of fact

28   should not be unduly prejudiced by testimony that is based on foreign concepts."  *Volk v. United*

United States District Court
Northern District of California

1    *States*, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999); *see also Stilwell v. Smith & Nephew, Inc*., 482

2    F.3d 1187, 1192 (9th Cir. 2007) ("In *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

3    119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court described the district court's

4    'gatekeeping role,' and required that 'all forms of expert testimony, not just scientific testimony'

5    survive scrutiny under Rule 702.") (quoting *White v. Ford Motor Co*., 312 F.3d 998, 1007 (9th

6    Cir. 2002)).

7                    **2.  Plaintiff's Motion to Strike**

8                         a.   Minieri

9            Plaintiff asks the Court to preclude Minieri from testifying because he is not qualified to

10   serve as an expert and his opinions or unreliable.  On the first issue, the Court concludes that

11   Minieri has sufficient qualifications to serve as an expert on general industry practices relating to

12   the provision of personal security and therefore declines to preclude Minieri from offering any

13   expert testimony.  On the other hand, Minieri has *not* demonstrated that he has any expertise or

14   training in the area of sexual assault, including the mental state or subjective beliefs of victims or

15   perpetrators or what constitutes consent.  Therefore, he will not be permitted to offer opinions at

16   trial that require expertise in this area.[10]

17           To the extent Plaintiff challenges the reliability of Minieri's opinions, the Court concludes

18   that Minieri has demonstrated some familiarity with the facts of the case and therefore, that any

19   shortcomings in his opinions based on lack of familiarity with the record can be addressed through

20   cross-examination.  The Court notes, however, that Minieri failed to comply with Federal Rule of

21   Civil Procedure 26, which requires an expert to identify the evidence upon which his opinions are

22   based, and improperly refused to testify at his deposition as to the facts conveyed to him by

23   counsel upon which he based his opinions.  Therefore, **within 45 days of this Order, Minieri**

24   **shall supply a complete list of the evidence upon which his expert report is based and**

25

26   _____

27   [10] The Court declines to draw more specific lines at this time regarding the type of testimony that
     Minieri will or will not be allowed to offer at trial as these distinctions are better decided when the
     Court is presented with specific testimony and the factual context in which that testimony is
28   offered is clear. Thus, the Court's ruling is without prejudice to any objections by Plaintiffs that
     the testimony Minieri seeks to offer goes beyond his expertise and therefore should be excluded.

United States District Court
Northern District of California

1   **Plaintiff shall be permitted to depose Minieri at her convenience but no later than 60 days**

2   **before the commencement of trial.**

3              b.   Control Risks and Brown

4              Plaintiff asks the Court to exclude the opinions in the Control Risks reports, either in their

5   entirety or in part, and preclude William Brown from offering expert opinions for two main

6   reasons: 1) Control Risks has a conflict of interest because it provided information to Verizon

7   about the risk level in Beirut upon which Verizon relied in 2018; and 2) when Brown was deposed

8   it was apparent that he did not have expertise as to many of the opinions that were offered in the

9   reports and Verizon has even admitted that he does not have expertise as to crime statistics, even

10  though the Control Risks reports rely on crime statistics in support of the opinions contained in

11  them about the risk of sexual assault in Beirut during the relevant period.

12             With respect to the first issue, the Court finds that any vested interest Control Risks may

13  have in advancing opinions favorable to itself with respect to its past service to Verizon does not

14  render the opinions in the reports so unreliable as to require exclusion.  Rather, it is likely this

15  issue can be addressed through cross-examination and the opinions of rebuttal witness.

16             The second issue is more difficult.  It appears that Verizon did not fully cooperate with

17  Plaintiff's attempts to depose the appropriate individual about the opinions expressed in the

18  Control Risks report.  Although it is undisputed that Plaintiff did not ask to depose Tosi and

19  Freeman, it is also apparent that Plaintiff relied on Verizon to identify the appropriate individual to

20  depose in the face of three authors and a fourth individual who signed one of the reports.  Plaintiff

21  was told by Verizon's counsel first that it was Burnard (who signed the first report) and then that it

22  was Brown. When Brown testified, however, he repeatedly testified that he was not familiar with

23  the facts on which the opinions in the reports were based but that his "team" was.  *See* Olivier

24  Decl., Ex. C (Brown Depo.) at 18-19 (testifying that he had read the Murphy and Claus reports but

25  not "in-depth" and that he had not reviewed any other evidence or pleadings in the case), 66-67

26  (stating that he would need to "defer to [his] colleagues" as to the crime statistics that were the

27  basis of the opinion that there was a limited potential for sexual assault in Beirut in the summer of

28  2018), 78 ("deferring to the authors as to how crime statistics are used to determine the different

United States District Court
Northern District of California

1   threat levels used by Control Risks).

2   To the extent that Verizon's failure to identify an appropriate witness in connection with

3   the Control Risks report may have deprived Plaintiff of an opportunity to address the bases for the

4   opinions contained in the reports, **Plaintiff will be permitted to depose the two authors of the**

5   **Control Risks reports at her convenience but no later than 60 days before the**

6   **commencement at trial.**  The Court concludes that with this remedy Plaintiff will be able to

7   challenge the reliability of the opinions expressed in the Control Risks report through cross

8   examination and therefore, that exclusion of those opinions is unnecessary.  The Court's ruling is

9   without prejudice, however, to any future evidentiary challenges Plaintiff may seek to assert to

10  opinions expressed by Control Risks that have not been directly addressed herein.

11  ### 3.  Verizon's Motion

12  #### a.   Claus

13  Verizon contends Claus is not qualified to offer opinions about employers' duty of care

14  with respect to security of employees who travel internationally based on her education and

15  experience, and that her 8-step model is not reliable.  It further contends she should not be allowed

16  to offer opinions about Plaintiff's PTSD or the foreseeability of Plaintiff's sexual assault because

17  she is not an expert in these areas, as she conceded at her deposition.  The Court finds that there is

18  ample evidence in the record that Dr. Claus is qualified to opine about employers' duty of care,

19  having written extensively on the subject and offered trainings and consulting services on the topic

20  for many years.  Likewise, the Court rejects Verizon's challenge to Dr. Claus's methodology.

21  Indeed, Verizon's own expert, William Brown, testified at his deposition that Dr. Claus's Plan-

22  Do-Check-Act model is "pretty standard" and that her more detailed 8-step model provides a

23  "thorough methodology" for addressing whether Verizon acted properly with respect to Plaintiff.

24  *See* Olivier Decl., Ex. C (Brown Depo.) at 89-90.

25  On the other hand, to the extent that Dr. Claus is not an expert on sexual assault or PTSD,

26  the Court may exclude opinions that require such expertise at trial.   The Court notes that not every

27  opinion that is connected in any way to sexual assault or PTSD necessarily requires expertise in

28  those areas, however.  Therefore, the Court concludes that Verizon's objections on this ground are

22

1    better decided at or shortly before trial when the context in which such opinions may be offered

2    are more apparent.  Further, neither Dr. Claus nor any other expert will be permitted to offer

3    opinions as to ultimate questions to be decided by the jury, such as whether particular conduct was

4    foreseeable.

5              b.   Murphy

6         Verizon contends Murphy does not have experience or education to qualify him as an

7    expert on the risks of travel for women in Beirut.  The Court finds that Murphy's experience is

8    sufficient to qualify him as an expert and that Verizon's challenges go to the weight of Murphy's

9    opinions rather than their admissibility. Therefore, the Court declines to exclude Murphy's

10    opinion on this ground.

11        **B.     Verizon's Summary Judgment Motion**

12             **1.   Legal Standards on Summary Judgment Under Rule 56**

13        Summary judgment on a claim or defense is appropriate "if the movant shows that there is

14    no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

15    law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

16    the absence of a genuine issue of material fact with respect to an essential element of the non-

17    moving party's claim, or to a defense on which the non-moving party will bear the burden of

18    persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

19        Once the movant has made this showing, the burden shifts to the party opposing summary

20    judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id*. (citation

21    omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed

22    must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he

23    inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive

24    evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v. Liberty

25    Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with

26    reasonable particularity, the evidence that precludes summary judgment.  *Keenan v. Allan*, 91 F.3d

27    1275, 1279 (9th Cir. 1996).

28        A party need not present evidence to support or oppose a motion for summary judgment in

United States District Court
Northern District of California

1    a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

2    to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir.

3    2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

4    are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co.,*

5    *Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all

6    reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

7    (2007), but where a rational trier of fact could not find for the non-moving party based on the

8    record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

9    *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### 2.  Legal Standards Governing FEHA Claims

11        Under FEHA, it is unlawful for an employer to harass an employee on the basis of sex.

12   Cal. Gov't Code § 12940(j)(1).  Section 12940(j)(1) provides for liability even where the

13   harassment is by a non-supervisory coworker or a nonemployee, providing in part:

> Harassment of an employee . . . shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the acts of nonemployees, with respect to harassment of employees . . . if the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing cases involving the acts of nonemployees, the extent of the employer's control and any other legal responsibility that the employer may have with respect to the conduct of those nonemployees shall be considered. An entity shall take all reasonable steps to prevent harassment from occurring.

21   *Id.*  The California Supreme Court has explained that the "knows or should have known"

22   requirement "is a negligence standard" and applies only to harassment by non-supervisory

23   employees or nonemployees whereas, an employer is strictly liable for sexual harassment by a

24   supervisor.  *State Dep't of Health Servs. v. Superior Ct.*, 31 Cal. 4th 1026, 1041 (2003).  The only

25   exception to strict liability for harassment by supervisory employees is that "[t]he employer is not

26   strictly liable for a supervisor's acts of harassment resulting from a completely private relationship

27   unconnected with the employment and not occurring at the workplace or during normal working

28   hours" – an exception that "must be rare." *Id.* n. 3.

24

1        An employer is liable for harassment by a nonemployee under section 12940(j)(1)

2  "whenever an employer (1) knows or should know of sexual harassment by a nonemployee and

3  (2) fails to take immediate and appropriate remedial action (3) within its control." *M.F. v. Pac.*

4  *Pearl Hotel Mgmt. LLC*, 16 Cal. App. 5th 693, 702 (2017). The language of Section 12940(j)(1)

5  "does not limit its application to a particular fact pattern." *Id.* In *M.F.*, the Court of Appeal found

6  that the plaintiff, a hotel housekeeper, had adequately alleged a violation of section 12940(j)(1)

7  based on allegations that she was raped by a trespasser who just before had approached two other

8  housekeepers and had come to the attention of a housekeeping manager. 16 Cal. App. 5th at 697.

9  The housekeeping manger broadcast the trespasser's activities and location to other housekeeping

10  managers, but the plaintiff's supervisor failed to check the floor where she was cleaning and where

11  the trespasser locked her in a room and assaulted and raped her. *Id.* at 698. The hotel employer

12  argued that it could not be held liable for sexual harassment under section 12940(j)(1) because the

13  plaintiff had not and could not "allege facts showing [it] knew the trespasser posed a risk to

14  housekeeping employees before he appeared on the hotel property and began harassing them" but

15  the court disagreed. *Id.* at 701.

16        The court in *M.F.* reasoned that "the fact [the defendant] may not have had any

17  responsibility to housekeeping employees under the FEHA before the trespasser appeared on the

18  hotel property does not preclude [defendant] from having such responsibilities after the trespasser

19  appeared, particularly after the trespasser began confronting and aggressively propositioning

20  housekeeping employees for sexual favors." *Id.* The court further observed that " '[t]he more

21  egregious the abuse and the more serious the threat of which the employer has notice, the more the

22  employer will be required under a standard of reasonable care to take steps for the protection of

23  likely future victims.' " *Id.* (quoting *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir.

24  2001) (holding that plaintiff, who was a flight attendant, could state a claim for sexual harassment

25  under Title VII where she was raped by a fellow flight attendant at a hotel where both were

26  staying during a layover where several other flight attendants had previously reported to the

27  employer that the same employee had raped them).

28        FEHA also makes it unlawful "[f]or an employer . . . to fail to take all reasonable steps

United States District Court
Northern District of California

necessary to prevent . . . harassment from occurring." Cal. Gov't Code § 12940(k).  "A plaintiff cannot state a claim for failure to prevent harassment unless the plaintiff first states a claim for harassment." *M.F.*, 16 Cal. App. 5th at 700-701 (citing *Featherstone v. Southern California Permanente Medical Group,* 10 Cal.App.5th 1150, 1166 (2017); *Trujillo v. North County Transit Dist.*, 63 Cal. App. 4th 280, 288–289 (1998)).

### 3.  Claim Four

In Claim Four, Plaintiff asserts a sexual harassment claim under section 12940(j)(1) based on Verizon's failure to provide security for Plaintiff despite a foreseeable risk that she would be sexually assaulted and its subsequent failure to take adequate remedial action.  Verizon seeks summary judgment in its favor on this claim on the grounds that Plaintiff's sexual assault was not foreseeable and that Verizon took prompt remedial action after it learned of the assault.  *See* Summary Judgment Motion at 10-14.  The Court finds that there are material disputes of fact as to both requirements that preclude summary judgment on this claim.

#### a.  "Knows or Should have Known"

As discussed above, the "knows or should have known" requirement under section 12940(j)(1) is based on negligence foreseeability standards.  The California Supreme Court has held that " 'foreseeability' as a test for negligence. . . .  means a level of probability which would lead a prudent person to take effective precautions."  *Farmers Ins. Grp. v. Cty. of Santa Clara*, 11 Cal. 4th 992, 1004 (1995).  Foreseeability is also relevant to the doctrine of respondeat superior, but in that context foreseeability "merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' "  *Id.*  (quoting *Rodgers v. Kemper Constr. Co.*, 50 Cal. App. 3d 608, 619 (1975)).

The California Supreme Court has described the negligence standard of foreseeability as follows:

> [I]t is well to remember that "**foreseeability is not to be measured by what is more probable than not**, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." (2 Harper & James, Law of Torts, supra, § 18.2, at p. 1020.) One may be held accountable for creating even " 'the risk of a slight possibility

1
2
3
4
5
6

of injury if a reasonably prudent [person] would not do so.' " (*Ewart v. Southern Cal. Gas Co.* (1965) 237 Cal.App.2d 163, 172, 46 Cal.Rptr. 631, quoting from *Vasquez v. Alameda* (1958) 49 Cal.2d 674, 684, 321 P.2d 1 (dis. opn. of Traynor, J.); *see also Crane v. Smith* (1943) 23 Cal.2d 288, 299, 144 P.2d 356; see generally, Rest.2d Torts, § 291**.) Moreover, it is settled that what is required to be foreseeable is the general character of the event or harm**—e.g., being struck by a car while standing in a phone booth—**not its precise nature or manner of occurrence**. (*Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 600, 110 P.2d 1044; *Gibson v. Garcia* (1950) 96 Cal.App.2d 681, 684, 216 P.2d 119; *see generally*, Rest.2d Torts, § 435, subd. 1, com. a.)

7    *Bigbee v. Pac. Tel. & Tel. Co.*, 34 Cal. 3d 49, 57–58 (1983) (emphasis added).

8    Further, even where the plaintiff is harmed by the intentional conduct of a third party, an

9    employer may be liable on the basis of negligence if the harm was foreseeable.  For example, in

10    *Lillie v. Thompson*, the employer assigned the plaintiff, a 22-year-old woman, to work alone

11    between 11:30 p.m. and 7:30 a.m. in an isolated area of a railroad yard. 332 U.S. 459, 460-461

12    (1947).  Her job involved receiving messages from men operating the trains and in order to do so,

13    she was expected to admit them to the building when they knocked.  *Id.*  The area was known to

14    be frequented by "dangerous characters" but the employer did not provide any security guard and

15    the area was poorly lit.  *Id.*  Plaintiff was injured when she opened the door in response to a knock

16    to receive a message and was attacked by a nonemployee.  *Id.*  The Supreme Court found that the

17    district court had improperly dismissed the plaintiff's claim against her employer, which was

18    asserted under the Federal Employee Liability Act ("FELA") on a theory of negligence, and

19    rejected the district court's conclusion that the employer could not be liable because the criminal

20    conduct of the attacker defeated the causation requirement of the claim.  *Id.* at 461-462.  The Court

21    explained:

22
23
24
25
26

We are of the opinion that the allegations in the complaint, if supported by evidence, will warrant submission to a jury. Petitioner alleged in effect that respondent was aware of conditions which created a likelihood that a young woman performing the duties required of petitioner would suffer just such an injury as was in fact inflicted upon her. That the foreseeable danger was from intentional or criminal misconduct is irrelevant; respondent nonetheless had a duty to make reasonable provision against it. Breach of that duty would be negligence, and we cannot say as a matter of law that petitioner's injury did not result at least in part from such negligence.

27    *Id.*; *see also 7735 Hollywood Blvd. Venture v. Superior Ct.*, 116 Cal. App. 3d 901, 904 (1981)

28    (recognizing the "well-established principles that while a criminal act of a third person is generally

United States District Court
Northern District of California

1   a super[s]eding cause of injury, such is not the case where intentional or negligent conduct creates

2   a foreseeable and unreasonable risk of harm from conduct of a third person") (citing Rest., Torts,

3   §§ 302B, 448, 449; *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 (1976)).

4        Applying these principles to the facts here, the relevant inquiry with respect to

5   foreseeability is whether a reasonably prudent person would have taken measures to reduce the

6   risk of the *general* type of harm inflicted on Plaintiff, that is, sexual assault by a business contact

7   while conducting the outreach that was a key part of Plaintiff's job.  Plaintiff is not, as Verizon

8   suggests in its motion papers, required to demonstrate that it was foreseeable that this particular

9   business acquaintance would sexually assault her.[11] Nor does the test of foreseeability turn

10  exclusively on the probability that harm may occur. Rather, as the court in *Bigbee* explained, the

11  test is whether a reasonably prudent person would take the risk into account in guiding their

12  conduct even if the risk is slight.  Therefore, the Court also rejects Verizon's argument that

13  "[t]here is nothing that would have suggested to Defendant a level of probability that would have

14  put Defendant on notice that Plaintiff would be sexually assaulted by the business acquaintance

15  with whom Plaintiff had socialized over the evening, and allowed into her hotel room."[12]

16  Summary Judgment Motion at 11-12.

17       Under the standards that apply to foreseeability in the context of negligence, there is

18  sufficient evidence to establish a material dispute of fact with respect to foreseeability.  As

19  discussed above, there is evidence that Plaintiff discussed her concerns about security on the trip

20  with her manager, that her manager initially told her that she would not be permitted to make the

21  trip because there were "too many strikes in the risk zone, starting with alone," and that one of

22  Verizon's third-party security providers designated Beirut as a high-risk city due, in part, to crime.

23  While Verizon attempts to avoid this evidence by offering evidence of its own it contends shows

24

25  [11] At oral argument, Verizon's counsel conceded that under the foreseeability standard "it doesn't
    have to be the specific risk of sexual harassment or a rape by somebody you know" but rather, the
26  standard requires more generally that Verizon knew or should have known that Plaintiff faced an
    increased risk of sexual harassment in Beruit.
27  [12] The Court also notes that this argument is based on a version of the facts that contradicts
    Plaintiff's account.  Drawing all reasonable inferences in Plaintiff's favor, as the Court is required
28  to do at this stage of the case, the Business Acquaintance entered Plaintiff's room *without* her
    permission to do so.

that Beirut was not a high-risk city and that Plaintiff could just as easily have been sexually

assaulted anywhere in the world, these arguments ask the Court to weigh the evidence and draw

inferences in Verizon's favor, which is improper on summary judgment. Nor does Verizon point

to any authority that establishes, as a matter of law, that the alleged rape was unforeseeable simply

because the perpetrator was a business acquaintance.[13]

Verizon's heavy reliance on *Capitol City Foods, Inc. v. Superior Ct.*, 5 Cal. App. 4th 1042,

1044 (1992) is misplaced. In that case, the plaintiff was raped by her supervisor outside of work

hours at the home of the supervisor's parents. 5 Cal. App. 4th at 1044. The plaintiff brought a

FEHA claim against her employer for sexual harassment and her employer sought summary

judgment on the ground that there was "an insufficient nexus between the supervisor's conduct

and his employment to hold the employer liable." *Id.* at 1044. The court of appeal agreed,

finding that under the principles of agency law the supervisor's conduct did not fall within the

scope of his employment and therefore, that the employer could not be held strictly liable for his

conduct under the doctrine of respondeat superior. *Id.* at 1050. In reaching this conclusion, the

court pointed to undisputed facts establishing that the "defendant conclusively refuted the

allegation [the supervisor] forced plaintiff to accompany him or coerced her in any way prior to

entering his bedroom." *Id.* In other words, the holding in *Capitol City Foods* is an example of the

"rare" exceptions to strict liability for harassment by supervisory employees where the facts

establish a "completely private relationship unconnected with the employment." *State Dep't of

Health Servs. v. Superior Ct.*, 31 Cal. 4th at 1041. The court in that case did not address whether

---

[13] Plaintiff also cites evidence she contends shows that her coworker's heavy drinking placed her in greater danger and that Verizon should have known of this risk but made no effort to determine whether his "profile" as a heavy drinker increase Plaintiff's risk. Opposition at 18-19. As Plaintiff does not point to evidence that Verizon had *actual* notice of the Coworker's drinking habits, this argument assumes that FEHA's "knew or should have known" standard imposed a duty to investigate whether he might pose a risk to Plaintiff. As neither party has addressed whether there is authority one way or the other on this question and there is sufficient evidence to demonstrate a material dispute of fact even apart from this theory, the Court declines to reach this question at this stage of the case. Nor need the Court reach Plaintiff's argument that notice of the conduct of the Business Acquaintance can be imputed to Verizon because the Coworker was in Beirut with Plaintiff and had a duty to act as a "conduit" to management about the harassment that was occurring. *See* Opposition at 22 (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 925 (9th Cir. 2000) (citing *Lamb v. Household Credit Servs.*, 956 F. Supp. 1511, 1517 (N.D. Cal. 1997))).

1    the employer could be held liable on an alternative theory of negligence – an argument that the

2    plaintiff apparently did not make.

3         The theory of Plaintiff's claim under section 12940(j)(1) is entirely different from the one

4    in *Capitol City Foods* as there is no dispute that Verizon cannot be held strictly liable for the

5    sexual assault by the Business Acquaintance on a theory of agency. As discussed above (and

6    Verizon acknowledges in its Summary Judgment Motion, *see* Summary Judgment Motion at 11)

7    foreseeability in the context of respondeat superior is based on different standards than are applied

8    to foreseeability under a theory of negligence.  Thus, the holding in *Capitol City Foods* that the

9    man who assaulted the plaintiff (who was a supervisory employee rather than a nonemployee) was

10   not acting within the scope of his employment is irrelevant to Plaintiff's claim.  The Court also

11   notes that the facts here are entirely distinguishable from the ones in *Capitol City Foods* because a

12   reasonable jury could conclude that meetings with business acquaintances such as the one here

13   occurred in Plaintiff's work environment.  *See Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 135

14   (2d Cir. 2001) (finding that rape by coworker at a hotel could be a "work environment" for the

15   purposes of Title VII harassment claim and observing that "[t]he circumstances that surround the

16   lodging of an airline's flight crew during a brief layover in a foreign country in a block of hotel

17   rooms booked and paid for by the employer are  very different from those that arise when

18   stationary employees go home at the close of their normal workday.").  Nothing in *Capitol City*

19   *Foods* provides a basis for the Court to hold that Plaintiff's claim under section 12940(j)(1) fails

20   as a matter of law.

21        Verizon's reliance on *Paugh v. P.J. Snappers*, No. 2004–T–0029, 2005 WL 407592 (Ohio

22   Ct. App. Feb. 18, 2005) is similarly misplaced.  There, the plaintiff alleged that she met with a

23   supervisory employee at a restaurant to apply for a job and that he drugged her drink and raped

24   her.  2005 WL 407592 at *1.  The plaintiff sued the employer for sex discrimination under Ohio

25   law but the court found that the employer was entitled to summary judgment under "the doctrine

26   of respondeat superior, or vicarious liability" on the claim because the supervisor's conduct was

27   "outside of the scope of his employment."  *Id.*  at *4.  In particular, it found that there was "no

28   evidence that [the supervisor's] actions were intended to facilitate or promote the business

United States District Court
Northern District of California

30

1   purposes of [the employer]" and there was "nothing in the record that support[ed] the conclusion

2   that [the supervisor] took advantage of [the plaintiff] by virtue of his supervisory position." *Id.*

3   As in *Capitol City Foods*, the facts and holding of *Paugh* are based on principles of agency law

4   and shed no light on the claim here, where Plaintiff does not seek to establish Verizon's liability

5   under a theory of respondeat superior.

6           Finally, Verizon's string cite to *Beyda v. City of Los Angeles*, 65 Cal.App.4th 511 (1998),

7   *Vizcaino v. Areas USA, Inc*., 2015 WL 13573816 (C.D. Cal., April 17, 2015), and *Savin v. City &*

8   *Cty. of San Francisco*, 2017 WL 2686546 (N.D. Cal. June 22, 2017), *see* Summary Judgment

9   Motion at 11, fares no better.  In *Beyda*, the plaintiff sought to show she was subjected to a hostile

10  work environment based on conduct towards other women of which the plaintiff was unaware but

11  the trial court excluded the evidence. 65 Cal. App. 4th at 516.   The court of appeal held that the

12  evidence was properly excluded because "[h]arassment against others in the workplace is only

13  relevant to the plaintiff's case if she has personal knowledge of it." *Id.* at 520. In other words, the

14  court explained, there must be a "nexus . . .between the allegedly hostile environment and the

15  plaintiff's experience in the workplace." *Id.*  Here, Plaintiff does not seek to establish harassment

16  based on conduct aimed at other women of which she was unaware and therefore, this case offers

17  no support for Verizon's foreseeability argument.

18          In *Vizcaino v. Areas USA, Inc*., the court found that a negligent hiring and retention claim

19  failed as a matter of law, citing the rule that " 'an employer's duty . . . is breached only when the

20  employer knows, or should know, facts which would warn a reasonable person that the employee

21  presents an undue risk of harm . . . in light of the particular work to be performed." 2015 WL

22  13573816, at *7 (quoting *Federico v. Super. Ct*., 59 Cal. App. 4th 1207, 1214 (1997) (emphasis

23  added)).  The court explained that under the principles of tort law, a claim for negligent retention

24  " 'requires some nexus or causal connection between the principal's negligence in selecting or

25  controlling an actor, the actor's employment or work, and the harm suffered by the third party.' "

26  *Id.* (quoting *Phillips v. TLC Plumbing, Inc*., 172 Cal. App. 4th 1133, 1139 (2009) (citing

27  Restatement (Third) of Agency § 7.05, cmt. c, illus. 5, p. 180)). Again, this case has no bearing on

28  Plaintiff's claim under section 12940(j)(1) because she does not assert a negligent retention claim

United States District Court
Northern District of California

1    and the standard upon which the holding in *Vizcaino* is based does not apply to her FEHA claim.

2         *Savin v. City & Cty. of San Francisco* also is not on point.  In that case, the court addressed

3    whether a priest who was assigned to a hospital unit and allegedly sexually harassed a social

4    worker assigned to the same unit was acting under color of state law for the purposes of

5    establishing liability under 42 U.S.C. § 1983.  2017 WL 2686546 at *1, 3.   The court concluded

6    that the plaintiff "failed to adequately allege the requisite nexus between the alleged sexual

7    harassment and [the priest's] official duties" and therefore he could not be held liable under

8    Section 1983. *Id.*  at *7-8.  As Plaintiff does not assert any claim that requires that she establish

9    state action and Verizon has offered no authority to suggest that those standards have any bearing

10   on her FEHA claim, Verizon's reliance on *Savin* is unavailing.

                    b.   Immediate Corrective Action Within Verizon's Control

12        Verizon argues that Claim Four fails as a matter of law for the further reason that once it

13   became aware of the assault it took immediate and appropriate remedial action.  Summary

14   Judgment Motion at 13-14.  In support of this argument, Verizon cites a Title VII case decided in

15   the Southern District of New York in which the plaintiff, a hotel employee, brought a sexual

16   harassment claim against her employer on the basis that she had been sexually assaulted by a long-

17   term guest of the hotel.  *Flower v. Mayfair Joint Venture*, 2000 U.S. DIST. LEXIS 2829 S.D.N.Y.

18   2000).   Hotel management investigated the assault by talking to the plaintiff and two other

19   employees and a manager talked to the guest about the assault, who was not asked to leave the

20   hotel.  *Id.*  at * 27-28. The plaintiff was instructed that in the future she should not talk to the

21   perpetrator or serve him and she experienced no further harassment while employed by the hotel.

22   *Id.*  The court found that this response was adequate to defeat the plaintiff's harassment claim on

23   summary judgment, placing particular emphasis on the fact that the hotel guest had "never

24   assaulted [the plaintiff] again" and noting that the plaintiff had "cite[d] no authority for her

25   proposition that Title VII requires her employer to ban a customer from its premises."  *Id.*  at *28.

26        The Court concludes that the holding in *Flower* does not comport with the approach taken

27   by the Ninth Circuit and California courts in addressing whether an employer has taken prompt

28   and appropriate remedial action once it learns of sexual harassment.  In particular, the Ninth

United States District Court
Northern District of California

32

United States District Court
Northern District of California

1   Circuit has recognized that "[t]o avoid liability under Title VII for failing to remedy a hostile

2   environment, employers may even have to remove employees from the workplace if their mere

3   presence would render the working environment hostile." *Ellison v. Brady*, 924 F.2d 872, 883

4   (9th Cir. 1991). *Ellison*'s holding appears to be inconsistent with the court's conclusion in *Flower*

5   that it was appropriate to grant summary judgment in the employer's favor because, as a matter of

6   law, it had no duty to evict from the hotel the guest who had sexually assaulted the plaintiff.

7   Moreover, California courts and courts in the Ninth Circuit have held that the question of whether

8   an employer's response was prompt and appropriate is generally a question of fact. *M.F. v. Pac.*

9   *Pearl Hotel Mgmt. LLC*, 16 Cal. App. 5th 693, 703 (2017) (citation omitted). As explained by one

10  court, it is particularly inappropriate to decide this question on summary judgment because the

11  adequacy of an employer's response depends, in part, on whether the employee continues to

12  experience a hostile work environment. *Reitter v. City of Sacramento*, 87 F. Supp. 2d 1040, 1046

13  (E.D. Cal. 2000). That question, in turn, depends on whether "the conduct be such that both

14  objectively and subjectively the conditions of employment are altered." *Id*. at 1045-1046. "The

15  question of [a] plaintiff's subjective state of mind is one of fact" and is generally considered

16  inappropriate for resolution on summary judgment." *Id.* (citing *Fonda v. Gray*, 707 F.2d 435, 438

17  (9th Cir.1983)).

18          In any event, the facts here differ from those in *Flower*. Here, there is evidence that

19  Plaintiff reported the assault almost immediately after it occurred to a Verizon employee who

20  appears to have been a managerial level employee and yet there is no evidence that she passed this

21  information on or that anyone from Verizon contacted Plaintiff to assist her in any way or alerted

22  the third-party provider of overseas medical and security assistance. According to Plaintiff's

23  account, she feared the Business Acquaintance would return and did not know who to contact for

24  help. A reasonable jury could conclude from this evidence that Verizon's response was

25  inadequate. *See Bradley v. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1612, 1630 (2008)

26  (holding that "[o]nce an employer is informed of the sexual harassment, the employer must take

27  adequate remedial measures" which requires that "temporary steps be taken to deal with the

28  situation while the employer determines whether the complaint is justified and 2) that permanent

1   remedial steps be implemented by the employer to prevent future harassment once the

2   investigation is completed.").

3         There is also evidence from which a reasonable jury could conclude that Verizon

4   conducted no investigation of the assault and that even while Plaintiff's manager instructed that

5   the Business Acquaintance be excluded from future events, an invitation to a September event in

6   San Francisco that Plaintiff would be attending was not withdrawn.  Rather, it is undisputed that

7   the Business Acquaintance flew to the United States to attend the event and would likely have

8   attended had it not been for Plaintiff's independent action of reporting the assault to the FBI.   The

9   fact that Plaintiff did not encounter him at the event therefore is not evidence of the adequacy of

10  Verizon's response.  In light of this evidence the Court concludes that Verizon is not entitled to

11  summary judgment on this question.

12        Accordingly, the Court DENIES summary judgment on Claim Four.

13        **4.  Claim Five**

14        Verizon requests summary judgment on Claim Five because it is derivative of Claim Four.

15  Because the Court concludes there are material issues of fact that preclude summary judgment on

16  Claim Four it also rejects Verizon's request for summary judgment on Claim Five.

17  **IV.   CONCLUSION**

18        For the reasons set forth above, the Court DENIES the Summary Judgment Motion.  The

19  Court DENIES Plaintiff's Motions to Strike except that the motion is GRANTED to the extent

20  that Minieri will not be permitted to offer opinions about sexual assault or PTSD that go beyond

21  his expertise, including without limitation opinions about the mental state or subjective beliefs of

22  victims or perpetrators or what constitutes consent.  Verizon's Motion to Strike is GRANTED to

23  the extent that Dr. Claus will not be permitted to offer opinions about sexual assault and PTSD

24  that go beyond her expertise as a standard of care expert and is DENIED in all other respects.  A

25  declaration by Minieri listing the evidence he relied upon in his report shall be filed within 45 days

26  of this Order.  Plaintiff may depose Minieri and the authors of the Control Risks reports at her

27

28

United States District Court
Northern District of California

34

convenience but no later than 60 days before the commencement of trial.

**IT IS SO ORDERED.**

Dated:  October 28, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California